**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PETER DRAGISIC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 11 C 999** |
| | ) | |
| **v.** | ) | **Magistrate Judge Michael T. Mason** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge:

Plaintiff, Peter Dragisic ("Dragisic" or "claimant"), has brought a motion for summary judgment [11] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner filed a response [14] asking the Court to uphold the decision of the Administrative Law Judge. We have jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, plaintiff's motion is granted in part.

**I.    BACKGROUND**

**A.    Procedural History**

Dragisic filed his application for period of disability and disability insurance benefits on March 19, 2008 alleging disability beginning April 15, 2007 due to right knee problems. (R. 47, 106-115.) His application was denied initially on June 24, 2008 (R. 47-52), and again after a timely request for reconsideration on October 17, 2008. (R. 53-58.) Thereafter, Dragisic requested a hearing, which was held on October 8, 2009

before Administrative Law Judge John L. Mondi ("ALJ" or "ALJ Mondi").  (R. 21-42.)

On November 5, 2009, ALJ Mondi issued a written opinion denying Dragisic's request for benefits.  (R. 9-17.)  Dragisic then filed a request for review of the ALJ's decision, which the Appeals Council denied on December 27, 2010.  (R. 1-3.)  At that time, the ALJ's decision became the final decision of the Commissioner.  *Zurawski v. Halter*, 245 F. 3d 881, 883 (7th Cir. 2001).  This action followed.

### B.    Medical Evidence

#### 1.    Treating Physicians

Records reveal that Dragisic visited Midland Orthopedic Association ("Midland") on May 15, 2006 complaining of a history of right knee pain.  (R. 260-264.)  Dragisic reported that the pain was caused by "wrestling, torn ligaments" and had been bothering him since 1974.  (R. 264.)  He indicated that he previously received an x-ray and "draining" from a Dr. John Sonnenberg.  (*Id.*)

Dr. Jay M. Brooker of Midland reported that Dragisic has a history of right knee pain with "some exacerbation of symptoms."  (R. 260.)  He noted that "recent x-rays reveal mild to moderate degenerative changes, medial joint space narrowing, and osteophyte formation."  (*Id.*)  He also found "crepitus on range of motion but no effusion or instability." (*Id.*)  Dr. Brooker went on to note that Dragisic has degenerative arthritis that will initially require anti-inflammatories.  (*Id.*)  If that did not work, Dr. Brooker stated he "will have [Dragisic] undergo injections."  (*Id.*)  It appears that Dr. Brooker prescribed Celebrex.  (R. 263.)  Dragisic did not show up for his follow-up appointment on June 6, 2006, and there is no indication he ever returned to Midland after his initial appointment.  (R. 205, 262.)

2

On May 22, 2009, Dragisic presented to the urgent care department of Hines VA Hospital ("Hines") complaining of chronic pain in his left hip and right knee. (R. 249.) He described his pain as "aching, nagging [and] sharp," and stated that standing and walking makes it worse. (R. 247.) Dragisic reported to Dr. Krishnamoorthi of Hines that he tore his ligaments while wrestling thirty years earlier, then "re-injured" the ligaments several times over the years. (R. 249.) Dragisic described pain on flexion and extension, but denied "clicking," "locking," or "collaps[ing]." (*Id.*) He explained that he saw an orthopedic doctor three to four years earlier at which time he was told he had a bone spur, and that surgery was not likely to help. (*Id.*) He was also told that his hip pain was a result of "over-compensating with his gait." (*Id.*) Dragisic stated that he had been laid off a year and a half earlier and lost his medical insurance. (*Id.*)

Dr. Krishnamoorthi's exam revealed crepitus and mild effusion in the right knee as well as "small pre-patellar bursal effusion." (R. 250.) Dragisic had a decreased range of motion in his right knee, and was unable to "fully extend and relax." (*Id.*) His gait was "limping to guard [right] knee." (*Id.*) Dr. Krishnamoorthi assessed chronic right knee pain, "likely significant fibrosis from old ligament/soft tissue tears," and "bony overgrowth." (*Id.*) He also agreed that Dragisic's chronic left hip pain "is a result of overcompensation," and noted early osteoarthritis. (*Id.*) Dragisic was given Toradol for the pain in the hospital and prescribed Naproxen and Acetaminophen for pain and swelling. (R. 246, 269.) Dr. Krishnamoorthi also gave Dragisic referrals to the Hines General Medical Care ("GMC") department to establish primary care and to the Hines Physical Medicine and Rehabilitation ("PM&R") clinic to be evaluated for physical therapy and the need for imaging, interventional, and surgical strategies. (R. 250.)

3

Dragisic saw a GMC nurse practitioner at Hines on June 23, 2009 and continued to complain of chronic right knee and left hip pain. (R. 239-240.) The nurse practitioner ordered x-rays, and referred Dragisic to Dr. Gunjan Sharma at the PM&R clinic. (R. 240.)

Dragisic saw Dr. Sharma on July 7, 2009, at which time he told Dr. Sharma that he had difficulty walking more than two blocks or standing more than ten minutes. (R.223.) He said the pain affects his work, relationships, and hobbies. (*Id.*) Dr. Sharma's physical examination revealed effusion and crepitus in the right knee, as well as limited range of motion. (R. 226-227.) Dr. Sharma described Dragisic's gait as "antalgic due to pain."[1] (R. 227.)

Dr. Sharma also reviewed Dragisic's x-rays. (R. 225-226.) The x-ray of the right knee revealed "moderate [degenerative joint disease] of the right knee and femoropatellar joints seen with some narrowing of the medial knee joint space." (R. 254.) Osteophyte formation was evident, including in the patellar area, and there was "soft tissue ossification adjacent to the medial condyle of the femur apparently related to previous trauma." (*Id.*) It was noted that these findings were consistent with Pellegrini-Stieda's disease. (*Id.*) There was no definite evidence of recent fracture, subluxation or bone destruction. (*Id.*) Small knee joint effusion was suggested in the supra-patellar bursal regions. (*Id.*) As for the results of the left hip x-ray, mild to moderate degenerative joint disease of the bilateral hips was suggested, but there was no

---

[1] Antalgic is defined as "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's Medical Dictionary for Health Consumers (2007).

evidence of recent fracture, subluxation, avascular necrosis, or metastases. (R. 255.) The sacroiliac joints appeared normal. (*Id.*) The reviewing radiologist also noted that Dragisic was a patient with "apparently known mild lumbar spondylosis." (*Id.*)

Based on the physical exam and the x-rays, Dr. Sharma assessed right knee pain due to Pellegrini-Stieda's disease. (R. 227.) He advised Dragisic to continue taking Naproxen for pain and suggested physical therapy two to three times a week for six weeks. (*Id.*) Dr. Sharma also ordered a MRI to rule out a meniscal tear. (*Id.*)

Dragisic returned to Hines for the MRI of his right knee on July 31, 2009. (R. 253.) Patello-femoral articulation showed degenerative joint disease changes and osteophytosis. (*Id.*) Cartilage wear of the femoral condyles was suspected. (*Id.*) Small to medium sized joint effusion was identified. (*Id.*) There were no signs of a miniscal tear. (*Id.*) The anterior cruciate ligament ("ACL") was poorly outlined and subchondral cysts were noted at the attachment of the ACL to the tibia. (*Id.*) A partial ACL tear was suspected since a few fibers were "visible coursing in the intercondylar notch." (*Id.*) The posterior cruciate ligament was normal in thickness and no tear was demonstrated. (*Id.*) Subchondral cysts were noted in the distal femur at the intercondylar notch. (*Id.*) The medial and lateral collateral ligaments were normal. (*Id.*)        On September 1, 2009, Dragisic had a follow-up appointment with Dr. Sung Ahn at the PM&R clinic to review the results of his MRI. (R. 230-234.) Dr. Ahn's notes reveal that Dragisic was limping, unable to extend his right knee, and exhibited "decreased heel strike." (R. 232.) Dr. Ahn noted that an ACL tear was suspected, recommended physical therapy as prescribed by Dr. Sharma on July 7, 2009, and further suggested gait training with a cane and balance training. (*Id.*)

### 2. State Agency Consultants and Examiners

On May 22, 2008, at the request of the Bureau of Disability Determination Services, Dragisic underwent a consultative examination with Dr. Dilip Patel of Midtown Physicians, S.C. (R. 206-209.) At that time, 57-year old Dragisic reported that he had been suffering from right knee pain for almost twenty years. (R. 206.) More specifically, Dragisic explained that he was a wrestler and injured his knee several times "requiring aspiration of fluid and cortisone injections in the past." (*Id.*) Dragisic stated he could manage the pain when he was younger, but now has limited strength due to aging. (*Id.*) He also complained of constant pain and stiffness in the right knee. (*Id.*) He said he is unable to stand for very long or bend his knee at all, but denied "any giving out or buckling of the knee." (*Id.*) Dragisic reported taking Tylenol. (*Id.*)

On examination, Dragisic was 5'11'' and weighed 250 pounds. (R. 207.) Dr. Patel's "HEENT" (head, eyes, ears, nose, and throat) exam revealed no remarkable results. (*Id.*) Dragisic's neck, heart, lungs, and abdomen were also unremarkable. (*Id.*) A musculoskeletal examination revealed that "both shoulders, both elbows, both wrists, and both hand grips were normal." (*Id.*) Both ankles and hips were also normal. (*Id.*) The right knee had "reduced range of movements, significant stiffness, moderate amount of pain, no instability, [and] some synovial thickening present." (*Id.*) There was no ankle edema, ulceration, or calf tenderness. (*Id.*) As for his back, Dragisic had "normal pain free range of movements with negative SLR except mild stiffness." (*Id.*) Dexterity and hand grips were normal. (R. 208.) Dr. Patel noted that Dragisic was unable to heel-toe walk or squat, but was able to get on and off the exam table. (*Id.*) Dragisic's gait was normal and he did not require an assistive device. (*Id.*) Based on

his examination, Dr. Patel assessed osteoarthritis, degenerative disease, and possible internal derangement. (*Id.*)

On June 18, 2008, Dr. Frank Jimenez completed a "Physical Residual Functional Capacity ("RFC") Assessment." (R. 212-219.) Dr. Jimenez determined that Dragisic could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and had no limitations in his ability to push or pull. (R. 213.) As for postural limitations, Dr. Jimenez determined Dragisic could only occasionally balance or climb ramps, stairs, ladders, ropes, or scaffolds "due to limits in [range of motion] of right knee." (R. 214.) Dr. Jimenez found no manipulative, visual, communicative, or environmental limitations. (R. 215-216.) In the "Additional Comments" section of the evaluation, Dr. Jimenez stated: "current medical evidence reveals right knee has reduced [range of motion], stiffness, and moderate amount of pain. No other conditions noted." (R. 219.)

On June 23, 2008, Gerald Coffman completed a "Vocational Consultant Case Analysis," in which he noted that Dr. Jimenez's RFC assessment limited Dragisic to "medium work activity."[2] (R. 162.) Coffman recognized that the additional postural restrictions indicated by the assessment would limit this general range of work, but ultimately determined that the performance of the majority of jobs at the medium exertional level would be possible. (*Id.*) And, although Coffman concluded Dragisic would be precluded from returning to his past work, Coffman provided examples of jobs

---

[2] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 CFR § 404.1567(c).

that could be performed with Dragisic's limitations and which existed in significant numbers, including hospital cleaner, wax ball knock out worker, and dining room attendant. (*Id.*)

On October 15, 2008, in connection with Dragisic's request for reconsideration, Dr. Virgilio Pilapil reviewed the file and Dr. Jimenez's RFC assessment. (R. 220-222.) Dr. Pilapil recognized that Dragisic had alleged a worsening of conditions, but concluded that a "comparison of current [Activities of Daily Living] and those from the prior filing reveal that the claimant has actually improved and is doing more things now than before." (R. 222.) As a result, Dr. Pilapil affirmed the prior determination. (*Id.*)

### C. Claimant's Testimony

At the hearing before ALJ Mondi on October 8, 2009, Dragisic testified as follows. Dragisic was born on December 14, 1951 making him 57 years old at the time of the hearing. (R. 25.) He is married and has five children. (R. 26.) As for education, Dragisic completed one year of college. (*Id.*)

At the time of the hearing, and for the past twenty-one years, Dragisic worked part-time at Midwest Sporting Goods. (R. 26.) When Dragisic started this job he worked as a sales clerk on the second floor. (*Id.*) About five years ago, he was moved to the first floor to work as a cashier after he started having difficulties moving around and lifting, and experienced excruciating pain. (R.26-27, 32.) In his position as a cashier, Dragisic sits on a stool and is not required to do any lifting. (R. 26, 32.) He can also stand and sit at his leisure. (R. 26.) Dragisic works three times a week for about three to four hours in the evening. (R. 27.) When asked by the ALJ whether he could do his current job at Midwest Sporting Goods full time, Dragisic responded in the

negative and explained he could not stand and walk for eight hours a day.  (R. 31-32.)

Until April 15, 2007 (and for approximately 22 years prior), Dragisic also worked full time at Citigroup as a clerk in the supply room department, prospectus department, and the file room.[3]  (R. 27.)  In that position, Dragisic was on his feet on and off all day and regularly lifted thirty-five to forty pound cases of paper.  (R. 28.)  At one point, Dragisic supervised other employees, which involved scheduling and assigning individuals to certain tasks.  (R. 35.)  This supervisory role involved a lot of moving around because Dragisic had to go from floor to floor to "check on certain things" and make sure everyone was doing their job.  (*Id.*)  About five years before he was laid off, another supervisor was appointed because Dragisic was having trouble moving around. (*Id.*)  Dragisic further testified that his co-workers "picked up the slack" when he started having trouble lifting boxes.  (R. 28.)  According to Dragisic, Citigroup laid him off when "they laid off a bunch of departments."  (R. 27.)  He also testified that they noticed he was having an increasingly tough time doing his job.  (*Id.*)

When asked about a possible explanation for his right knee pain, Dragisic testified that his doctors had told him his knee is calcified on both sides and that he has a huge spur in the middle of his knee preventing him from bending his knee.  (R. 28-29.) He also indicated that the doctors told him he has a torn ligament.  (R. 28.)  He stated he also suffers from pain in his left hip, which he has been told is a result of overcompensating for his right knee.  (*Id.*)  Dragisic testified that the only procedure he has ever had is the draining of the fluid in his knee, which was done approximately three

---

[3] We note that both the ALJ and the vocational expert refer to "Smith Barney" instead of Citigroup. We will use Citigroup as that is how the claimant referred to his employer.

to four years ago. (*Id.*) A doctor also told him three or four years ago that he may need a knee replacement at some point in time. (R. 29.)

Dragisic can walk only a couple of blocks and stand for only ten minutes before his knee gets aggravated. (R. 29.) He can climb a flight of stairs, but only with a great deal of difficulty or with a hand railing. (R. 30.) Dragisic testified that he got a cane three years ago, but does not use it consistently because he tries "not to walk or stand if he can help it." (R. 29-30.) He does not bring the cane to work because he just moves from his car to the building and then sits on a stool. (R. 32.) He does bring it along if he knows he will have to stand or walk for any length of time. (R. 30.) Dragisic cannot stoop or kneel. (R. 30, 33.) He cannot lift any amount of weight while standing due to his inability to bend his knee and his imbalance. (R. 29.) He could probably lift thirty to forty pounds while sitting. (*Id.*) Dragisic takes Naproxen and Acetaminophen for his pain and swelling. (R. 32.)

Dragisic testified that he can take care of himself, although getting dressed is very difficult because he cannot put on his pants or socks. (R. 31.) As such, his wife usually helps him get dressed and has done so for the last five years. (*Id.*) Dragisic said he can go to the store alone, but not without a great deal of difficulty. (*Id.*) He does not mow the lawn or do any other home maintenance. (*Id.*) As for exercise, he testified that the VA has directed him to do certain exercises to strengthen his thigh muscle. (*Id.*)

### D. Vocational Expert's Testimony

Vocational expert William J. Schweihs ("VE" or "VE Schweihs") also appeared and testified at the hearing before ALJ Mondi. VE Schweihs first testified that Dragisic's

10

past position as a supply clerk would normally be classified as semi-skilled and heavy. (R. 37.)  However, based on Dragisic's testimony, VE Schweihs placed that position in the medium range of physical exertion.  (R. 37-38.)  The VE further classified Dragisic's tenure as a supervisor as light and skilled, but noted that Dragisic returned to the medium level of exertion when a new supervisor was appointed.  (R. 38.)

ALJ Mondi then posed some hypothetical questions to the VE.  He first asked the VE to consider an individual in the claimant's age range (55-57), with the same work experience and educational background as claimant.  (R. 39.)  ALJ Mondi asked the VE to assume that this individual had the RFC that was assessed for Dragisic in June of 2008, that is, the ability to perform medium work with a postural limitation against more than occasional climbing.  (*Id.*)  With this individual in mind, ALJ Mondi asked the VE whether such a person could perform Dragisic's past work.  (*Id.*)  VE Schweihs responded that the individual could perform Dragisic's primary past work as a supply clerk or stock supervisor.  (*Id.*)

Next, ALJ Mondi asked the VE if his answer would change if the hypothetical individual was  "precluded from crouching, crawling, and climbing of ladders, ropes, or scaffolds."  (R. 39-40.)  The VE said his answer would not change if bending was not also precluded.  (R. 40.)  Nor would his answer change if the person would need the option to sit down for five minutes after standing for thirty minutes.  (*Id.*)

Lastly, the ALJ asked VE Schweihs what the vocational outlook would be for a hypothetical individual with the same limitations and capabilities to which Dragisic testified at the hearing.  (R. 40.)  The VE responded that an individual with the combination of Dragisic's purported pain and inability to stand for longer than ten

minutes at a time would be precluded from working as a supply clerk or stock

supervisor. (*Id.*) In a follow up question, Dragisic's attorney asked if an individual with

Dragisic's described level of pain and the inability to stand for ten minutes would be

capable of performing any medium or light work. (R. 41.) VE Schweihs responded that

such an individual would not be able to perform medium or light work. (*Id.*)

## II.     Analysis

### A.      Standard of Review

We will affirm the ALJ's decision if it is supported by substantial evidence and

free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th

Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.

1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). We must consider

the entire administrative record, but we will not "re-weigh evidence, resolve conflicts,

decide questions of credibility, or substitute our own judgment for that of the

Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford

v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the

evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary

support or an adequate discussion of the issues." *Id.*

While the ALJ need not discuss every piece of evidence in the record, he "must

build an accurate and logical bridge from the evidence to his conclusion." *Dixon v.

Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not choose to

disregard certain evidence or discuss only the evidence that favors his or her decision,"

*Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009), but "must confront the evidence that

12

does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B.   Analysis under the Social Security Act

To qualify for disability benefits, the claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. At step five, the burden shifts to the Commissioner to show that the "claimant is capable of performing work in the national economy." *Id.* at 886.

ALJ Mondi applied this five step analysis. At step one, he found that Dragisic's

part-time employment at Midwest Sporting Goods does not amount to substantial gainful activity.  (R. 15.)  At step two, ALJ Mondi determined that Dragisic suffers from the following severe impairments: "degenerative joint disease of the right knee and hips, lumbar spine spondylosis, and obesity."  (*Id.*)  Then, at step three, the ALJ found that Dragisic does not have an impairment or combination of impairments that meets or medically equals a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1.

Before advancing to step four, ALJ Mondi assessed Dragisic's RFC and concluded that he can perform "light work as defined in 20 CFR 404.1567(c), that does not involve crouching, crawling, or climbing of ladders, ropes or scaffolds."[4]  (R. 15.)  Lastly, ALJ Mondi found that Dragisic is capable of performing his past relevant work as a stock supervisor.  (R. 17.)  As such, he concluded that Dragisic was not disabled under the Act.

Dragisic now argues that the ALJ's decision was improper because he (1) failed to consider all of his impairments; (2) failed to analyze his obesity in combination with his other impairments; (3) failed to obtain the required medical source statement from the consultative physical examiner; (4) failed to properly assess his credibility; (5) failed to consider the entire record; and (6) failed to pose a proper hypothetical question to the VE.  Before turning to these arguments, we note that Dragisic has raised these arguments as separate distinct issues in a somewhat haphazard fashion.  But, because many of these issues can be addressed in combination, we have taken the liberty to do

---

[4] We note that the ALJ improperly cited section "c" of 20 CFR § 404.1567 as opposed to section "b," which defines light work as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."

so in the order we see fit.

### C.    The ALJ Failed to Properly Assess Dragisic's Credibility

One of Dragisic's many arguments is that the ALJ erred in assessing his credibility.  Because we agree with Dragisic and find the ALJ's credibility assessment glaringly deficient, we address this issue first.  We first note that on the record before us, the credibility assessment is particularly important because, as the ALJ himself recognized, an individual with the level of pain and limitations to which Dragisic testified "could not do past work or be expected to adjust to other jobs existing in significant numbers in the economy."  (R. 14-15.)

"A claimant's testimony is relevant to the ALJ's assessment of a claimant's RFC and the ALJ has a duty to properly evaluate and assess a claimant's credibility."  *Pena v. Astrue*, No. 11 C 3029, 2012 WL 638760, at *7 (N.D. Ill. Feb 27, 2012).  It is well settled that the ALJ is in the "best position to see and hear the witnesses and assess their forthrightness."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  As such, a reviewing court affords the ALJ's credibility finding special deference and may only disturb a credibility finding if it is "patently wrong," that is, unreasonable or unsupported. *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).  Nonetheless, despite this deferential standard of review, Seventh Circuit precedent confirms that the ALJ must explain his decision in such a way that allows the reviewing court to determine whether he reached the decision in a rational manner, logically based on his specific findings and the evidence in the record.  *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (*citing Skarbek v. Barnhart,* 390 F.3d 500, 505 (7th Cir. 2004)).

The ALJ must also follow the requirements of Social Security Ruling ("SSR") 96-

7p. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). Among other things, SSR 96-7p requires ALJs to consider the entire case record when evaluating an individual's credibility and give specific reasons for the weight given to the individual's statements. 1996 WL 374186, at *4 (S.S.A. July 2, 1996).

Here, in discrediting Dragisic's testimony, ALJ Mondi began with the boilerplate template again recently criticized by the Seventh Circuit.[5] *See Bjornson v. Astrue*, --- F.3d ----, 2012 WL 280736, at *4 (7th Cir. Jan. 31, 2012). Then, ALJ Mondi took issue with what he apparently viewed as a sparse treatment record. Specifically, in a paragraph discussing Dragisic's failure to return for injections at Midland, ALJ Mondi states "he has not sought nor has any other treatment been recommended." (R. 16.) This statement is perplexing seeing as in the very next paragraph ALJ Mondi acknowledges that Dragisic recently sought treatment at Hines and was advised to start physical therapy.[6] (*Id.*) Unfortunately, the ALJ did not inquire into whether Dragisic had indeed started physical therapy.

Further, and perhaps more importantly, although ALJ Mondi is free to consider the frequency of treatment in assessing the claimant's credibility, he may not draw any inferences "from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the

---

[5] Specifically, ALJ Mondi stated: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity." (R. 16.)

[6] Also perplexing is that ALJ Mondi describes the prescribed physical therapy as a treatment for the hip pain. Our reading of the record reveals that the physical therapy was prescribed to ameliorate both the chronic knee pain and the hip pain.

case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7, 1996 WL 374186, at *7. Courts have often reiterated that the ALJ must explore evidence in the record of an inability to pay before relying on a spotty treatment record to discredit the claimant's testimony. *See Alesia v. Astrue*, 789 F. Supp. 2d 921, 934 (N.D. Ill. 2011) ("Where the record contains evidence that a claimant could not afford treatment, the ALJ must explore the claimant's ability to pay before relying on the lack of treatment to support an adverse credibility finding."). But here, ALJ Mondi made no reference to the evidence in the record indicating that Dragisic had no medical insurance and could not afford treatment.[7] (R. 180, 247.)

The ALJ's reliance on Dragisic's daily activities is also disconcerting. In relying on those activities, ALJ Mondi recognized that Dragisic worked part-time and stated that "he is able to take care of himself and his home." (R. 14.) Unfortunately, this statement is a misrepresentation of claimant's testimony regarding his ability to take care of his home because Dragisic testified he does not mow the lawn or do any home maintenance. (R. 31.)

On the issue of daily activities, the Commissioner cites to claimant's responses to the activities of daily living questionnaires dated May 7, 2008 and October 7, 2008, and argues that those responses support the ALJ's credibility determination. (R. 153-161, 172-180.) But, the ALJ did not cite to those questionnaires or to any of those activities in his opinion. Nor does the Commissioner explain why we should simply infer that

---

[7] We note separately that the absence of medical care might be similarly relevant to Dragisic's lack of prescription medication, which the ALJ also relied on in discrediting Dragisic's testimony. This should be explored on remand.

Dragisic maintained that same level of activity at the time of the hearing, which took place a year later.

So, in sum, although the boilerplate template alone does not require remand, the other shortcomings and the lack of articulation in the ALJ's credibility assessment do. On remand, the ALJ should take care to build an accurate and logical bridge between the evidence and his credibility determination and address contrary evidence.

### D. The ALJ Failed to Consider All of the Evidence When Assessing Claimant's RFC and Failed to Properly Consider Claimant's Obesity

Notwithstanding the ALJ's insufficient credibility determination, which naturally calls into question the ALJ's RFC assessment, a few additional errors in the latter warrant discussion. Specifically, and as discussed in more detail below, the ALJ failed to consider all of the evidence when assessing Dragisic's RFC, and also failed to consider Dragisic's obesity in connection with his other impairments.

"The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The ALJ must base his RFC assessment on all the relevant record evidence, and must provide a narrative discussion describing how the evidence supports his conclusions. SSR 96-8p, 1996 WL 374184, at **5, 7 (S.S.A. July 2, 1996); *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

As an initial matter, we find no merit to the claimant's assertions that the ALJ failed to consider the June 2009 x-ray of his knee, the July 2009 MRI of his knee, or his purported use of a cane. Like the Commissioner, we easily conclude that the ALJ did consider the x-ray and the MRI. (*See* R. 16.) That the ALJ did not mention every

specific finding of those radiology reports is of no moment.  Similarly, the ALJ did indeed consider Dragisic's testimony regarding his use of a cane.  (*See* R. 14.)

But this is where we part ways with the Commissioner.  As the claimant points out, glaringly absent from the ALJ's opinion is any discussion of, or even mention of, repeated references by three separate physicians to Dragisic's abnormal gait.  As we discussed above, on May 22, 2009 (exactly one year after the state agency consultative exam), Dr. Krishnamoorthi noted that Dragisic had a limping gait to guard his right knee. (R. 250.)  Then, on July 7, 2009, Dr. Sharma reported that Dragisic's gait was "antalgic" due to pain.  (R. 227.)  Dr. Ahn also described Dragisic's gait as "abnormal" and "limping" on September 1, 2009.  (R. 232.)

All of this evidence flies in the face of the ALJ's conclusion that "there was no evidence that the claimant has extensive limitations in ambulation," and is indeed relevant to the RFC assessment.  Unfortunately, because ALJ Mondi did not address this evidence, remand is required.  *See Indoranto*, 374 F. 3d at 474 (noting that the ALJ must confront the evidence that does not support his conclusion and explain why it was rejected).[8]

Dragisic also argues that the ALJ failed to consider the effect of his obesity on his other impairments.  Pursuant to Social Security Ruling 02–1p, an ALJ must specifically consider obesity when making an RFC determination because obesity can increase the

---

[8] We also agree that the ALJ's failure to address vocational consultant Gerald Coffman's finding that claimant could *not* perform his past work raises some concern.  (R. 162.)  As the Commissioner argues, this failure may in fact be harmless because Coffman ultimately concluded that Dragisic could perform other medium level jobs.  Nonetheless, should the ALJ again determine on remand that Dragisic is indeed capable of performing his past work, we would advise him to articulate why he reached a different conclusion than did the agency consultant.

claimant's limitations.  SSR 02-1P, 2000 WL 628049.

Here, after finding obesity to be one of Dragisic's severe impairments, ALJ Mondi provided nothing more than a cursory assessment of the effects of that obesity.  In fact, ALJ Mondi simply recited the requirements of SSR 02-1p and stated "the claimant's knee pain may be in part due to his body habitus."  (R. 17.)  Like claimant, we fail to see how this satisfies the requirements of SSR 02-1p.  And, although a failure to consider the effects of obesity may be a harmless error under certain circumstances, given the other deficiencies in the ALJ's assessment, we are not confident that failure amounts to a harmless error here.  *See Villano v. Astrue*, 556 F. 3d 558, 562-63 (7th Cir. 2009).

Lastly, because we have determined that the ALJ improperly assessed Dragisic's credibility and his RFC, on remand the ALJ must reconsider the hypothetical questions posed to the VE.  *See Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009) (questions posed to the VE must incorporate all impairments and limitations that the ALJ accepts as credible).[9]

## III.  CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is granted in part.  This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.  Plaintiff's requests for fees pursuant to the

---

[9] On the record before us, we see little reason to comment on claimant's remaining argument, *i.e.*, that his due process and equal protection rights were violated when the ALJ failed to obtain a medical source statement or a RFC assessment from the consultative examiner.  As the Commissioner points out, the lack of a medical source statement does not necessarily render a consultative examination incomplete. 20 CFR § 404.1519n(c)(6); *Eaton v. Astrue*, 07 C 382, 2008 WL 2477580, at *7 n.5 (N.D. Ill. June 16, 2008).  We also fail to see how the fact that one Arizona claimant benefitted from a medical source statement (or that a Tennessee ALJ has purportedly stated that claimants there benefit from similar statements) rises to the level of an equal protection/due process violation.

Equal Access to Justice Act, 28 U.S.C. § 2412, and the Social Security Act, 43 U.S.C. §

406, are denied without prejudice as premature.  It is so ordered.


**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**


**Dated:**        **March 15, 2012**

21